## APPEAL OF J. S. HOSKINS LUMBER CO.

Docket No. 2390.    Submitted April 30, 1925.    Decided February 18, 1926.

The Board has jurisdiction of an appeal from a determination of the Commissioner, made subsequent to the enactment of the Revenue Act of 1924, denying a claim in abatement of income and profits taxes assessed prior to the date of such enactment.

*W. S. Hammers, Esq.*, for the taxpayer.
*A. H. Fast, Esq.*, for the Commissioner.

Before STERNHAGEN and MARQUETTE.

This appeal involves deficiencies in income and profits taxes for the years 1917 and 1918 in the amounts of $8,030.98 and $10,030, respectively.

### FINDINGS OF FACT.

The taxpayer is a Maryland corporation, with its principal office at Baltimore. It is, and was during the years referred to herein, engaged in the lumber and timber business.

On or about January 2, 1923, the taxpayer was furnished with a copy of a revenue agent's report dated January 2, 1923, recommending that additional tax be assessed in the amount of $8,030.98 for the year 1917 and $10,030 for the year 1918. The taxpayer filed a protest against the proposed assessment of additional tax for the years 1917 and 1918, and requested special relief under section 210 of the Revenue Act of 1917, and section 328 of the Revenue Act of 1918.

On March 14, 1923, the Commissioner notified the taxpayer by letter of a deficiency in tax of $8,030.98 for the year 1917 and that an immediate assessment thereof would be made in order that collection might not be jeopardized by delay. The tax was assessed on March 26, 1923, and a claim for the abatement thereof was filed by the taxpayer.

Under date of March 20, 1924, the following letter was sent to the taxpayer by the Commissioner:

Reference is made to your protest of January 4, 1924 against the proposed assessment of additional income and profits taxes for the years 1917 and 1918, as set forth in Revenue Agent's report of January 2, 1923, and a request that special relief be granted under Section 210 for the year 1917 and Section 328 for the year 1918.

Your claim for refund of $8,030.98, income and profits tax, for the year ending December 31, 1917, has been examined and is hereby rejected for reason that your claim for relief under Section 210 has been given careful consideration and assessment under this section has been denied.

Your request for special relief under Section 327 and 328 of the year 1918 has been given careful consideration and computation of tax under this section has been denied. Additional tax as indicated in office letter of January 24, 1924, will be assessed at the expiration of fifteen days from date of this letter unless an appeal for reconsideration is made to the Commissioner within that time.

The rejection of this claim will officially appear in next schedule to be approved by the Commissioner.

Under no circumstances should payment be made until a bill is received from the Collector of Internal Revenue for your district and remittance should then be made to him.

Under date of May 29, 1924, the following letter was sent to the taxpayer by the Commissioner:

Your appeal under date of April 3, 1924 from the findings of the Income Tax Unit in respect to your returns for the years 1917 and 1918 has been transmitted to the Committee on Appeals and Review.

In accordance with Treasury Decision 3492, there is attached a copy of the transmittal letter.

The transmittal letter showed an additional tax due of $10,030 for 1918 and that a claim for the abatement of the 1917 additional tax assessed in the amount of $8,030.98 had been denied. The sole ground for the taxpayer's appeal to the Committee on Appeals and Review was the denial by the Commissioner of assessment under section 210 of the Revenue Act of 1917 for the year 1917, and under section 328 of the Revenue Act of 1918 for the year 1918.

Under date of January 8, 1925, the Commissioner notified the taxpayer as follows:

An audit of your income and profits tax returns for the calendar years 1917 and 1918 has resulted in the determination of a deficiency in tax of $10,030.00 for 1918, as shown by the Bureau letter dated January 24, 1924.

In accordance with the provisions of Section 274 of the Revenue Act of 1924, you are allowed 60 days from the date of this letter within which to file an appeal to the United States Board of Tax Appeals contesting in whole or in part the correctness of this determination.

Where a taxpayer has been given an opportunity to appeal to the United States Board of Tax Appeals and has not done so within the 60 days prescribed and an assessment has been made, or where a taxpayer has appealed and an assessment, in accordance with the final decision on such appeal has been made, no claim in abatement in respect of any part of the deficiency will be entertained.

If you acquiesce in this determination and do not desire to file an appeal, you are requested to sign the enclosed agreement consenting to the assessment of the deficiency and forward it to the Commissioner of Internal Revenue, Washington, D. C., for the attention of IT : E : SM ELD. In the event that you acquiesce in a part of the determination, the agreement should be executed with respect to the items agreed to.

104881—27——57

STATEMENT

In re: J. S. Hoskins Lumber Co.
Baltimore, Md.

| Year | Deficiency in Tax |
|------|-------------------|
| 1917 | None. |
| 1918 | $10,030.00 |

Reference is made to your income and profits tax returns for the calendar years 1917 and 1918 and to your protest dated April 3, 1924.

You are advised that after a thorough review of your case, the Bureau holds that on the basis of comparative data, no abnormality affecting net income has been disclosed which would bring your case within the scope of Paragraph (d) of Section 327. Furthermore, the audit of your case discloses no exceptional hardship evidenced by gross disproportion between the tax computed without the benefit of Section 328 and the tax computed by reference to the representative corporations specified in that Section. The determination of your tax liability for 1917, as set forth in office letter dated March 14, 1923, and for 1918, as set forth in office letter of January 24, 1924, is, therefore sustained.

In accordance with the above conclusions, your claim for the abatement of $8,030.98 income and profits taxes for 1917 will be rejected.

The right of appeal to the United States Board of Tax Appeals as indicated on page 1 of this letter refers only to any deficiency in tax indicated herein, inasmuch as there is no provision in the Revenue Act of 1924 granting the right of appeal against the determination of any tax assessed prior to June 2, 1924.

The taxpayer, about the year 1910, purchased a tract of land containing 1,200 acres, of which 800 acres were timber land and 400 acres were unimproved farm land. It was necessary for the taxpayer to purchase the unimproved farm land in order to acquire the timber land. The farm land had very little value.

After the taxpayer had removed the timber referred to, it tried to dispose of the land, but was unable to find a purchaser. It therefore improved the land by clearing and draining it, constructing buildings and fences, and putting on fertilizer, and proceeded to cultivate it. All expenditures made by the taxpayer in improving and cultivating the land were capitalized and the amount so expended was credited with amounts received from the sale of farm products, etc.

Upon audit of the taxpayer's return for the year 1917, the Commissioner segregated the various amounts expended by the taxpayer in connection with the farm land and reduced its invested capital by the accumulated depreciation thereon and by the amount of the accumulated operating loss for the years prior to 1917. By reason of this adjustment, the taxpayer's invested capital for the year 1917 was reduced by the amount of $14,976.14. Similar adjustments were made for the year 1918, reducing the invested capital for that year by $18,108.76.

On June 28, 1916, the taxpayer sold to one William F. Halley, for $12,000, the timber rights in certain lands located in North Carolina. Halley paid to the taxpayer $1,000 in cash at the time of the sale and gave to it, for the balance of the purchase price, 14 promissory notes dated June 28, 1916, 10 of the notes being for $800 each and four for $750 each. The notes bore interest at the rate of 6 per cent from date.

The first note became due October 1, 1916, and one note became due on the first day of each month thereafter until November 1, 1917, when the last note became due. The notes were subsequently paid, although it appears that, on account of conditions which arose due to the World War, they were not all paid when they became due. However, at the time of the sale, Halley had other property, which had a value of at least twice the amount of the notes in question, and the notes at that time were actually worth their face value and could have been sold by the taxpayer for that amount.

The profit to the taxpayer on the sale of the timber rights to Halley was $2,267.53. The Commissioner treated the sale as a sale on the installment plan and allocated part of the profit arising therefrom to the year 1917 and subsequent years.

In the year 1918, the taxpayer built a planing mill in Canada, at a cost of $5,307.28, for the purpose of manufacturing ship knees to be used in the building of wooden ships. The ship knees so manufactured were sold to the United States Navy Yard, Brooklyn, N. Y., the United States Navy Department, the Great Lakes Boat Building Co., and other ship building companies, and were used principally on ships built by the United States Shipping Board. Shipments of ship knees could only be made by the taxpayer upon a permit from the United States Government. At the conclusion of hostilities in November, 1918, the taxpayer closed down the mill and it remained closed down until it was sold in 1921 for $100.

The taxpayer, during the year 1918, had in its employ at its Canadian mill three men—Chambers, Piper, and Ryder. Chambers was working as foreman on a commission basis and the others were on regular salaries. The mill was closed before the end of the year 1918, and at the time the taxpayer was indebted to Chambers, Piper, and Ryder for services performed. The exact amount of the indebtedness, however, was not known to the taxpayer, and the matter was therefore allowed to go over until the year 1919, when one of the taxpayer's officers went to Canada and determined the amount of the indebtedness. Chambers at that time was paid $1,069.45, Piper, $237.78, and Ryder, $182.28. These amounts were for services rendered in the year 1918, but were not entered on the taxpayer's books until the year 1919.

In the year 1918, the taxpayer, as above stated, closed down the planing mill it had been operating in Canada for the manufacture of ship knees, and it was compelled for that reason to find a new location for the storage of the ship knees it had on hand. It therefore purchased a parcel of land in Baltimore, Md., known as the Fallaway property. This land was held under the ground rent system, and there was a building or shed thereon, which was owned by parties other than those from whom the taxpayer purchased the land. The building or shed was used by an excavating company for a stable and storehouse. The taxpayer purchased this shed for $1,150, and also paid to a real estate agent the amount of $149.38, as a commission on the sale, and to the City of Baltimore $885, as assessment on the property, ground rent taxes, and certain minor expenses, in the total amount of $106.50. The taxpayer tore out the stalls, made repairs to the shed, and thereafter used it for the storage of the ship knees brought from Canada. The total cost to the taxpayer of the building was $2,358.43, all of which was charged to expense for the year 1918 and deducted from gross income. The Commissioner has disallowed the deduction.

In the conduct of its business, it is necessary for the taxpayer to purchase and keep on hand a considerable quantity of "rafting gear," consisting of chains, poles, axes, wedges and cant bars, used in the rafting and piling of logs. All of this gear has heretofore been carried in a gear account on the taxpayer's books. When issued for use on a raft of timber sold by the taxpayer, the gear is charged to the purchaser of the timber at cost, and, if it is returned by him, he is credited with the cost price of the gear, less 10 per cent for shrinkage.

On Jaunary 1, 1917, the taxpayer's gear account had a debit balance of $10,621.53, which represented the inventory value of the gear then on hand. During the year 1917, purchases of gear were made amounting to $5,925.56, and sales were made in the amount of $723.15. On November 21, 1917, the gear account was reduced by the amount of $4,059.19, which included depreciation in the amount of $708.09, leaving a debit balance in the account on January 1, 1919, of $11,764.45. During the year 1918, purchases of gear were made in the amount of $5,246, and sales of gear were made in the amount of $101.28. On December 31, 1918, the taxpayer reduced the gear account by the amount of $4,572.03, which included a write-off for depreciation in the amount of $547.39. The useful life of rafting gear is not more than two years.

The taxpayer, at the end of each year, had in process of shipment a considerable quantity of its product, which it had sold, but for which it had not received freight bills. It was therefore the taxpayer's practice to credit its customers with an estimated amount of freight charges and to set up on its books a reserve therefor. At the

opening of the next year, the amounts credited to the shippers would be reversed and their accounts subsequently credited with the actual freight charges as they were ascertained. At the beginning of the year 1917, the taxpayer had on its books a reserve for freight charges in the amount of $12,773.14. During the year 1917, the amount charged to freight was $110,694.24, and that amount was deducted by the taxpayer in computing its net income for the year 1917. The current amount of freight bills for 1917 was $91,114.21. The reserve at December 31, 1917, was $32,353.21, of which $19,508.07 represented the increase during the year 1917. The correct amount of freight bills credited or paid for the year 1918 was $100,159.44, and the amount deducted on the taxpayer's return for 1918 was $72,966.88. The reserve for freight bills at December 31, 1918, was $5,160.65.

In its petition the taxpayer alleged that it is entitled to special assessment for the years 1917 and 1918 under the provisions of section 210 of the Revenue Act of 1917 and section 328 of the Revenue Act of 1918, but at the hearing it presented no evidence in support of this claim.

#### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be made on 10 days' notice, under Rule 50.

#### OPINION.

MARQUETTE: The Commissioner filed a plea in bar of the right of the taxpayer to maintain its appeal as to the year 1917, on the ground that "The Commissioner of Internal Revenue has not since the enactment of the Revenue Act of 1924 proposed the assessment of a deficiency tax for the year 1917, nor has he rejected a claim for the abatement of a jeopardy assessment made for a deficiency tax for the year 1917."

The evidence in this appeal discloses that the tax for the year 1917, involved herein, was assessed in March, 1923, under the provision of section 250 (d) of the Revenue Act of 1921. The taxpayer filed a claim for the abatement of the additional tax, and after a hearing of the claim for abatement, had before the Committee on Appeals and Review, the Commissioner on January 8, 1925, mailed to the taxpayer a letter which is in part as follows:

> You are advised that after a thorough review of your case, the Bureau holds that on the basis of comparative data, no abnormality affecting net income has been disclosed which would bring your case within the scope of Paragraph (d) of Section 327. Furthermore, the audit of your case discloses no exceptional hardship evidenced by gross disproportion between the tax computed without the benefit of Section 328 and the tax computed by refer-

ence to the representative corporations specified in that Section. The determination of your tax liability for 1917, as set forth in office letter dated March 24, 1924, is therefore, sustained.

In accordance with the above conclusions, your claim for the abatement of $8,030.98 income and profits taxes for 1917 will be rejected.

In our opinion, the action of the Commissioner, as set forth in the letter of January 8, 1925, was a final determination of the income and profits tax due from the taxpayer for the year 1917, from which the taxpayer has the right of appeal to this Board. *Appeal of Joseph Garneau Co.*, 1 B. T. A. 75; *Appeal of Terminal Wine Co.*, 1 B. T. A. 697.

The second issue raised by this appeal is whether or not the Commissioner erred in reducing the taxpayer's invested capital for the years 1917 and 1918 by the accumulated depreciation on its farm buildings and the accumulated farm operating losses. The evidence establishes that the taxpayer purchased the farm land in question as a necessary incident to the purchase of a tract of timber. The land had little value and was not salable, and the taxpayer, therefore, in order to make it salable, erected buildings and fences thereon, and otherwise improved it. This occurred about the year 1910, and from that time, up to and including the year 1918, the taxpayer cultivated and operated the land as a farm, although farming was not in any way a part of its regular business.

The expenditures made by the taxpayer in improving the land were clearly of a capital nature, but we can not hold that the taxpayer should be permitted to capitalize the losses sustained from year to year in the operation of the farm. The cost of the farm, with its improvements, became a part of the taxpayer's invested capital, but the operating losses should have been taken into consideration each year in determining the taxpayer's profit or loss from its entire business. The improvements on the farm were subject to exhaustion, wear and tear, like any other of the taxpayer's depreciable assets, and, as the exhaustion, wear and tear thereof occurred, it should have been accounted for in the same manner as the exhaustion, wear and tear of the other assets. We are of the opinion that the Commissioner properly charged the accumulated depreciation and farm operating losses against the taxpayer's accumulated earnings, and that invested capital should be reduced accordingly.

The next question is whether or not the profit of $2,267.53, realized by the taxpayer on the sale of timber rights to Halley in the year 1916, was income in that year or should be allocated over the period in which the several notes representing the deferred payments were paid.

We see no reason for holding that the sale was otherwise than for cash or its equivalent. The deferred payments were represented by notes due in from 3 to 16 months, three of which of a total face value of $2,400 fell due and apparently were paid during the year 1916. The taxpayer held title to the timber rights as security for the payment of the notes, and it further appears that, regardless of that security, the notes were worth their face value and could have been sold or discounted for that amount. The profit arising from the sale was clearly income to the taxpayer for the year 1916.

With respect to the taxpayer's planing mill in Canada, the evidence shows that it was built by the taxpayer in the year 1918, at a cost of $5,307.28, for the purpose of manufacturing articles contributing to the prosecution of the World War. At the cessation of hostilities in November, 1918, the mill became useless to the taxpayer and was closed down and remained in that condition until it was sold in the year 1921 for $100. The taxpayer sustained a loss in this transaction in the amount of $5,207.28, which it is entitled to deduct in computing its net income for the year 1918. *Appeal of Walcott Lathe Co.*, 2 B. T. A. 1231.

The evidence presented by the taxpayer also discloses that, during the year 1918, it had in its employ in its Canadian mill three men, Chambers, Piper, and Ryder, and that, when the mill was closed down in November 1918, it was indebted to them for services they had performed in that year. The exact amount of the indebtedness, however, had not been determined and was not determined and paid until some time in the year 1919. At that time, Chambers was paid $1,069.45, Piper, $237.78 and Ryder, $182.28. The taxpayer's books were kept on the accrual basis and, as the services were rendered and payment therefor was due in the year 1918, the amount of the indebtedness was properly accruable on the taxpayer's books in that year and deductible in computing its net income.

The next issue is whether or not the taxpayer is entitled to deduct from gross income for the year 1918 the cost of acquiring and altering a certain building or shed, located on what is known as the Fallaway property, in Baltimore, Md. The evidence shows that it purchased this shed at a cost of $1,150 and made certain alterations and paid assessments and taxes due. The total amount expended was $2,258.43. After the alterations had been made, the shed was used as a place to store ship knees, which the taxpayer shipped to Baltimore after it closed down its planing mill in Canada. The taxpayer claims that the shed was acquired for the production of articles contributing to the prosecution of the World War, that it had little or no salvage value, and that the taxpayer is entitled to deduct the entire cost thereof in computing its net income for the

year 1918. However, as far as the evidence shows, the shed was still in use at the end of the year 1918 and was serving the purpose for which it was acquired. Apparently, its value in terms of use to the taxpayer had not diminished at the end of the year 1918, and, if we were to hold, which we do not, that the shed was acquired for the production of articles contributing to the prosecution of the World War, the taxpayer is nevertheless not entitled to an allowance for the amortization of the cost thereof in the year 1918.

With reference to the allowance to which the taxpayer is entitled for the exhaustion, wear and tear of its rafting gear in the years 1917 and 1918, we are of the opinion that the useful life of that property was not to exceed two years and that the allowance should be computed on that basis.

The only other question presented by the record herein relates to the reserves set up by the taxpayer on its books at the close of the taxable years 1916, 1917, and 1918, to cover freight charges on products that had been shipped but for which freight bills had not been received. Although merely estimates, these reserves were included in the amounts which the taxpayer deducted from gross income in the year 1918, and the effect thereof was that, in computing its net income for the years 1917 and 1918, the taxpayer deducted on account of freight charges $19,580.07 more for the year 1917, and $27,192.56 less for the year 1918, than the amount of such charges actually paid or incurred in those years. These reserves represented an indefinite liability, which could not be determined until the freight was actually paid, and they should not have been deducted by the taxpayer in computing its net income for the years 1917 and 1918. Only the amounts of freight charges actually paid or incurred in those years should have been deducted. The taxpayer's income for the year 1917 should therefore be increased by $19,580.07, and that for the year 1918 should be decreased by $27,190.56.